**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |  |
|---|---|---|
| ADVANCED CODING TECHNOLOGIES LLC, | § § § § | Case No. |
| Plaintiff, | § § § | **JURY TRIAL DEMANDED** |
| v. | § § | |
| GOOGLE LLC, | § § § | |
| Defendant. | § § § § | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Advanced Coding Technologies LLC ("ACT" or "Plaintiff") for its Complaint against Defendant Google LLC ("Google" or "Defendant"), for patent infringement under 35 U.S.C. § 271 and alleges as follows:

**THE PARTIES**

1.     Plaintiff ACT is a limited liability company, organized and existing under the laws of the State of Texas, with its principal place of business located at 104 East Houston Street, Suite 140, Marshall, Texas 75670.

2.     Defendant Google is a Delaware corporation and maintains its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043, and may be served with process via its registered agent, Corporation Service Company at 251 Little Falls Drive, Wilmington, Delaware19808. Upon information and belief, Google does business in Texas, directly or through intermediaries, and offers its products and/or services, including those accused herein of infringement, to customers and potential customers located in Texas, including in the

judicial Eastern District of Texas.

## JURISDICTION

3.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1338 and 1367.

4.      This Court has specific and personal jurisdiction over Defendant consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute. Upon information and belief, the Defendant has sufficient minimum contacts with the forum because Defendant transacts substantial business in the State of Texas and in this Judicial District. Further, Defendant has, directly or through subsidiaries or intermediaries, committed and continues to commit acts of patent infringement in the State of Texas and in this Judicial District as alleged in this Complaint, by, among other things, offering to sell and selling products and/or services that infringe the Patents-in-Suit.

5.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391 and 1400(b). Google is registered to do business in Texas and, upon information and belief, Google has transacted business in the Eastern District of Texas and has committed acts of direct and indirect infringement in the Eastern District of Texas. Google has regular and established places of business in this Judicial District as set forth below and is deemed to reside in this Judicial District.

6.      Google is a multi-national technology company that collects, stores, organizes, and distributes data. In addition to its service model for distribution of data (*e.g.*, movies, search results, maps, music, etc.), Google has an expansive regime that gathers data on residents of this District through the hardware devices it sells (*e.g.*, phones, tablets, and home audio devices) and, also, through the operating systems and apps it provides. As an example, Google gathers data when a

resident runs its operating systems and apps (*e.g.,* location services).[1] As another example, Google gathers data when a resident interacts with Google's plethora of services such as search, email, music, and movie streaming. *See* https://safety.google/privacy/data/ (indicating that Google gathers data from "things you search for," "Videos you watch," "Ads you view or click," "Your location," "Websites you visit," and "Apps, browsers, and devices you use to access Google services"). As yet another example, Google gathers data from  "where you've been," "everything you've ever searched—and deleted," "all the apps you use," "all of your YouTube history," "which events you attended, and when," "information you deleted [on your computer]," "your workout routine," "years' worth of photos," and "every email you ever sent."[2] In addition to extensive data gathering of information on residents of this District, Google has a substantial presence in this District directly through the products and services Google provides residents of this District (some of which also gather data).[3]

7.      Google describes itself as an "information company."[4] Its vision is "to provide access to the world's information in one click," and its mission is "to organize the world's information and make it universally accessible and useful."[5] Making information available to

---

[1] *See e.g.*, "AP Exclusive: Google tracks your movements, like it or not," https://apnews.com/828aefab64d4411bac257a07c1af0ecb/AP-Exclusive:-Google-tracks-yourmovements,-like-it-or-not

[2] *See* https://www.theguardian.com/commentisfree/2018/mar/28/all-the-data-facebook-google-has-on-you-privacy

[3] Non-limiting examples include Google Search, Maps, Translate, Chrome Browser, YouTube, YouTube TV, Google Play Music, Chromecast, Google Play Movies and TV, Android Phones, Android Wear, Chromebooks, Android Auto, Gmail, Google Allo, Google Duo, Google+, Google Photos, Google Contacts, Google Calendar, Google Keep, Google Docs, Google Sheets, Google Slides, Google Drive, Google Voice, Google Assistant, Android operating system, Project Fi Wireless phone systems, Google Pixel, Google Home, Google Wifi, Daydream View, Chromecast Ultra.

[4] See "This Year's Founder's Letter" by Alphabet CEO, Sundar Pichai, https://blog.google/inside-google/alphabet/this-years-founders-letter//

[5] https://panmore.com/google-vision-statement-mission-statement

people wherever they are and as quickly as possible is critical to Google's business.

*Google Global Cache (GGC)*

8.      Google's CEO, Sundar Pichai, explained, "We want to make sure that no matter who you are and where you are or how advanced the device you are using—Google works for you."[6] To meet this goal, Google developed a content delivery network that it calls the Edge Network.

9.      One non-limiting example of physical presence in this Judicial District is Google's Edge Network. Google provides web-based products and services, such as Google Maps, Find My Device, and Google Chrome, to users throughout the world, including in this Judicial District. These products and services are in high demand. Google reports that the Android operating system has more than 2 billion monthly active devices, and Google Maps surpassed 1 billion users as of May 2017.[7]

10.     Google's Edge Network, itself, has three elements: Core Data Centers, Edge Points of Presence, and Edge Nodes.[8] The Core Data Centers (there are eight in the United States) are used for computation and backend storage. Edge Points of Presence are the middle tier of the Edge Network and connect the Data Centers to the internet. Edge Nodes are the layer of the network closest to users. Popular content, including Google Maps, Google Messages, mobile apps, and other digital content from the Google Play store, is cached on the Edge Nodes, which Google refers to as Google Global Cache or "GGC."

---

[6] https://time.com/4311233/google-ceo-sundar-pichai-letter/
[7] *See* https://www.theverge.com/2017/5/17/15654454/android-reaches-2-billion-monthly-active-users
[8] https://peering.google.com/#/infrastructure

11.     Google Global Cache is recognized as one of Google's most important pieces of infrastructure,"[9] and Google uses it to conduct the business of providing access to the world's information. GGC servers in the Edge Nodes function as local data warehouses, much like a shoe manufacturer might have warehouses around the country. Instead of requiring people to obtain information from distant Core Data Centers, which would introduce delay, Google stores information in the local GGC servers to provide quick access to the data.

12.     Caching and localization are vital for Google's optimization of network resources. Because hosting all content everywhere is inefficient, it makes sense to cache popular content and serve it locally. Doing so brings delivery costs down for Google, network operators, and internet service providers. Storing content locally also allows it to be delivered more quickly, which improves user experience. Serving content from the edge of the network closer to the user improves performance and user happiness. To achieve these benefits, Google has placed Edge Nodes throughout the United States, including in this Judicial District. Google describes these Edge Nodes as the workhorses of video delivery.

13.     Google's GGC servers are housed in spaces in this Judicial District leased by Google. Google's GGC servers are housed in spaces leased by Google from Internet Service Providers (ISPs) whose networks have substantial traffic to Google and are interested in saving bandwidth. Hosting Google servers allows ISPs to save both bandwidth and costs, as they do not incur the expense of carrying traffic across their peering and/or transit links.

14.     When an ISP agrees to host a GGC server, the parties enter into a Global Cache Service Agreement, under which Google provides:

- hardware and software—including GGC servers and software—to be housed in the

---

[9] https://www.boostability.com/content/why-google-cache-is-important-to-your-seo

host's facilities;

- technical support; service management of the hardware and software; and

- content distribution services, including content caching and video streaming.

In exchange, the host provides, among other things, a physical building, rack space where Google's computer hardware is mounted, power, and network interfaces. All ownership rights, title, and intellectual property rights in and to the equipment (*i.e.*, the hardware and software provided by Google) remain with Google and/or its licensors.

15.    Multiple ISP-hosted GGC servers are in this Judicial District. Google provides the location of its GGC servers, namely, Sherman, Tyler, and Texarkana.



Source: *Uniloc 2017 LLC v. Google LLC*, Case No. 2:18-cv-00550, Dkt. 1 at 8 (E.D. Tex. 2018); https://peering.google.com/#/infrastructure.

16.     Suddenlink Communications, for example, is an ISP that hosts six GGC servers in Tyler, Texas.

17.     CableOne is an ISP that hosts three GGC servers in Sherman, Texas and three GGC servers in Texarkana, Texas.

18.     Google caches content on these GGC servers located in this Judicial District.

19.     Google's GGC servers located in this Judicial District cache content that includes, among other things: (a) maps; (b) messages; and (c) digital content from the Google Play store.

20.     Google's GGC servers located in this Judicial District deliver cached content for the items in the preceding paragraph to residents in this Judicial District.

21.     Google generates revenue (a) by delivering video advertising; (b) from apps; and (c) from digital content in the Google Play store.

22.     Google treats its GGC servers in this Judicial District the same as it treats all of its other GGC servers in the United States.

23.     The photographs below show Google's GGC servers hosted by Suddenlink and the building where they are located at 322 North Glenwood Boulevard, Tyler, Texas 75702.


Exterior


Interior Rack Spaces


Google GGC Servers

24.     Google not only exercises exclusive control over the digital aspects of the GGC, but also exercises exclusive control over the physical server and the physical space within which the server is located and maintained.

25.     This Judicial District has previously determined that the GGC server itself and the place of the GGC server, both independently and together, meet the statutory requirement of a "physical place." *See Seven Networks, LLC v. Google LLC*, Case No. 2:17-cv-00442-JRG, Dkt. 235 at 24 (E.D. Tex. July 19, 2018).

26.     Likewise, this Judicial District has determined that GGC servers and their several locations within this Judicial District constitute "regular and established place[s] of business" within the meaning of the special patent venue statute. *See Seven Networks, LLC v. Google LLC*, Case No. 2:17-cv-00442-JRG, Dkt. 235 at 38 (E.D. Tex. July 19, 2018).

27.     Similarly, this Judicial District has determined that the GGC servers and their locations within the various ISPs within this Judicial District are "places of Google" sufficient to meet the statutory requirement of § 1400(b). *See Seven Networks, LLC v. Google LLC*, Case No. 2:17-cv-00442- JRG, Dkt. 235 at 41 (E.D. Tex. July 19, 2018).

*Google's Google Wi-Fi at Starbucks Locations in this Judicial District*

28.     Google provides Wi-Fi infrastructure and Wi-Fi service at Starbucks locations in this Judicial District. Google and Starbucks entered into an agreement in which Google provides its Google Wi-Fi or Google Fiber service at all Starbucks locations in this Judicial District, including at Starbucks stores and at Target stores.[10] First-time customers connect and use Google Wi-Fi on their devices in this Judicial District by selecting "Google Starbucks" from their respective device's list of available wireless networks and entering their respective name, email

---

[10] https://www.starbucks.com/store-locator?map=32.467135,-95.387478,8z

address, and postal code. Return customers are automatically connected to Google Wi-Fi on their respective devices at any Google Wi-Fi location. Upon connecting to the Google Wi-Fi locations in this Judicial District, Google provides connected customers with Internet access over Google's infrastructure and services.



Source: https://www.starbucks.com/store-locator?map=32.49512,-94.568225,11z&place=marshall%20tx

29.     Google uses its Google Wi-Fi infrastructure and Google Wi-Fi services at Starbucks locations in this Judicial District to provide customers with telecommunications services through its own phone carrier network, Google Fi. Google Fi is owned and operated by Google. In order to use Google Fi phone service in this Judicial District, Google provides its customers with special SIM cards and software to connect to and automatically switch between four sources of network infrastructure and services: T-Mobile, Sprint, US Cellular, and public Wi-Fi networks. As described below, Google has entered into agreements with T-Mobile, Sprint, and US Cellular to lease the carriers' infrastructure and services to provide Google Fi customers with voice and data services. As a fourth source, Google Fi uses public Wi-Fi networks, including the Google Wi-Fi at Starbucks locations in this Judicial District, to provide its phone carrier service. The Google

9

Wi-Fi at Starbucks locations in this Judicial District are fixed geographical locations. They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently permanent. They are "of the defendant" because Google has contractual and/or property rights to use the Google Wi-Fi locations to operate its businesses, including the Google Fi phone carrier business.

30.    Google determines whether a Google Fi customer in this Judicial District uses a certain Wi-Fi network, including the Google Wi-Fi networks at Starbucks locations, using the Google-provided SIM card and software on the customer's phone.

*Google's "Google Fi"*

31.    As described above, Google owns, operates, and provides telecommunications infrastructure and service in this Judicial District through its own phone carrier network, Google Fi. Google provides cellular and Wi-Fi infrastructure and services for phone, messaging, and data services in this Judicial District. Google provides its customers voice and high-speed data coverage (4G LTE) for cities such as Tyler, Longview, and Marshall, Texas.



Source:  https://fi.google.com/coverage?q=marshall%20tx

32.    The cell towers used for Google's services are fixed geographical locations. They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently permanent. They are "of the defendant" because Google has contractual and/or property rights to use the cell towers to operate its business. Google also ratifies the service locations through its coverage lookup service.



Source: https://fi.google.com/about/coverage

33.     With this coverage lookup service, Google advertises its ability to provide cell coverage in this Judicial District and its selected cell towers in and near this Judicial District to provide the advertised coverage (*e.g.*, 2G, 3G, or 4G LTE) depending on the location in the Judicial District. *See* https://fi.google.com/about/coverage/. Google is not indifferent to the location of its cell towers. It "established" and "ratified" them where they are for a specific business purpose.

34.     Residents of this Judicial District also directly contract with and are billed by Google for these services.



Source: https://fi.google.com/about/plan

*Google Cloud Interconnect (GCI) and Direct Peering*

35.     Google additionally services its customers in this Judicial District (and other districts) through yet other facilities it has in this Judicial District. More specifically, Google's equipment is located in this Judicial District in Denton County, Texas at two facilities referred to as "Megaport." At the Megaport facilities in this Judicial District, Google offers two services: Google Cloud Interconnect (GCI) and Direct Peering.

36.     Google's Cloud Interconnect (GCI) is a service from Google that allows customers to connect to Google's Cloud Platform directly, as opposed to, for example, over the public network.

Interconnect > Documentation                                    
# Partner Interconnect Overview                                 SEND FEEDBACK

Google Cloud Interconnect - Partner (Partner Interconnect) provides connectivity between your on-premises network and your VPC network through a supported service provider. A Partner Interconnect connection is useful if your data center is in a physical location that can't reach a Dedicated Interconnect colocation facility or if your data needs don't warrant an entire 10 Gbps connection.

## Before you use Partner Interconnect

> ★ **Note:** Partner Interconnect requires that you separately obtain services from a third-party network service provider. Google is not responsible for any aspects of Partner Interconnect provided by the third-party service provider nor any issues outside of Google's network.

- You must be familiar with the Cloud Interconnect terminology described in Key Terminology.
- You must work with a supported service provider to establish connectivity between their network and your on-premises network.

## How does Partner Interconnect work?

Service providers have existing physical connections to Google's network that they make available for their customers to use.

After you establish connectivity with a service provider, you can request a Partner Interconnect connection from your service provider. After the service provider provisions your connection, you can start passing traffic between your networks by using the service provider's network.

The following diagram provides a high-level overview of a customer using a service provider to connect to Google:



Basic Partner Interconnect topology (click to enlarge)

Source: https://cloud.google.com/interconnect/docs/concepts/partner-overview

13

37.     Google's Direct Peering services allow its customers to exchange Internet traffic between its customers' networks and Google's at one of its broad-reaching Edge network locations, such as the one at Megaport.

Interconnect  >  Documentation  >  Google Cloud

# Direct Peering

☆ ☆ ☆ ☆ ☆

SEND FEEDBACK

Direct Peering allows you to establish a direct peering connection between your business network and Google's edge network and exchange high-throughput cloud traffic. This capability is available at any of more than 100 locations in 33 countries around the world. Visit Google's peering site to find out more information about Google's edge locations.

When established, Direct Peering provides a direct path from your on-premises network to Google services, including the full suite of Google Cloud Platform products. Traffic from Google's network to your on-premises network also takes that direct path, including traffic from VPC networks in your projects. GCP customers must request direct egress pricing be enabled for each of their projects after they have established direct peering with Google. Refer to pricing for details.

## Considerations

If used with GCP, Direct Peering doesn't produce any custom routes in a VPC network. Traffic sent from resources in a VPC network leaves by way of a route whose next hop is either a *default Internet gateway* (a default route, for example) or a Cloud VPN tunnel. If the destination for the traffic matches your on-premises IP ranges, it could be eligible for discounted egress rates, as described below.

To send traffic through Direct Peering using a route whose next hop is a Cloud VPN tunnel, the IP address of your on-premises network's VPN gateway must be in your configured destination range.

Direct Peering exists outside of Google Cloud Platform. Instead of Direct Peering, the recommended methods of access to GCP are Cloud Interconnect – Dedicated or Cloud Interconnect – Partner.

See the next section to determine which of these solutions is right for you.

Source: https://cloud.google.com/interconnect/docs/how-to/direct-peering

38.     In establishing such a direct connection, Google provides the necessary physical equipment at Megaport to enable GCI or Direct Peering connections. At least the Megaport facility shown below is located in this Judicial District and is advertised by Google as a GCI facility.

| Dallas | Alestra 🔗 | Layer 2 and 3 |
| --- | --- | --- |
| | Arelion 🔗 | Layer 2 and 3 |
| | C3NTRO 🔗 | Layer 2 and 3 |
| | Console Connect by PCCW Global 🔗 | Layer 2 and 3 |
| | Cox 🔗 | Layer 2 and 3 |
| | DE-CIX 🔗 | Layer 2 and 3 |
| | Equinix 🔗 | Layer 2 and 3 |
| | InterCloud 🔗 | Layer 2 and 3 |
| | Internet2 🔗 | Layer 2 and 3 |
| | Lumen 🔗 | Layer 2 and 3 |
| | MCM Telecom 🔗 | Layer 2 and 3 |
| | Megaport 🔗 | Layer 2 and 3 |
| | PacketFabric 🔗 | Layer 2 and 3 |
| | Transtelco 🔗 | Layer 2 and 3 |

Source: https://cloud.google.com/network-connectivity/docs/interconnect/concepts/service-providers#north-america

39. Clicking on the Megaport link from the screenshot of Google's website in the preceding paragraph directs a customer to the details for directly connecting to Google's equipment at the facility in this Judicial District to connect to Google's GCI service.



Source: https://www.megaport.com/integrations/google-cloud-partner-interconnect/

40.     More particularly, the Google-linked Megaport site explains how a Google customer can use the Google Cloud Platform console to enable connection to the Google equipment at the Megaport facility in this Judicial District.



Source: https://docs.megaport.com/cloud/megaport/google/

41.     Both Google's website and Megaport's website advertise the peering service and point a consumer to the website, www.peeringdb.com, for details. The peering DB website lists Megaport Dallas as a Google peering facility.

## Who can peer with Google?

Google recommends Google Cloud customers to use a Verified Peering Provider instead of Direct Peering.

Connecting with a Verified Peering Provider lets Google customers reach all publicly available Google resources without the complexity of managing Direct Peering connectivity to Google.

Google Cloud customers that choose a Verified Peering Provider do not need to meet Google's Direct Peering requirements and can work directly with a Verified Peering Provider to acquire internet services that provide access to Google.

To view a list of available Verified Peering Providers, see their connectivity to Google, learn about their services, and find providers in different areas, see the Google Edge Network.

Google recommends Google Cloud customers who do not use a Verified Peering Provider to privately peer with Google. Private peering provides dedicated physical ports between Google and customers, and can provide better performance and reliability than public peering.

When privately peering, Google requires physical redundancy with at least two separate connections to Google in a single metropolitan area. Each physical connection must have its own IP addressing.

Any Google Cloud customers that meet Google's technical peering requirements can be considered for Direct Peering. Google can peer at locations listed in our PeeringDB entry.

For more information about requirements, and to review Google's peering best practices for Google Cloud customers, visit Google peering.

Source: https://cloud.google.com/interconnect/docs/how-to/direct-peering

Megaport - Google IX Peering Locations:

- MegaIX: Ashburn, Dallas, Los Angeles, Seattle, Singapore, Sofia, Sydney

- AMS-IX: Chicago, New York, Bay Area

See PeeringDB for additional details.

Source: https://knowledgebase.megaport.com/cloud-connectivity/google-cloud-platform-direct-peering/



Source: https://www.peeringdb.com/net/433

42.     Megaport's website also confirms, in its "Looking Glass" tool, the presence of
Google at its facility—(AS No. 15169).



Source: https://lg.megaport.com/

43.     Both of Megaport's "Dallas" locations are in the Eastern District of Texas in Denton County.[11] The larger Megaport facility, the Carrollton facility, is located at 1649 West Frankford Road and is the largest of its kind in the State of Texas.[12] The smaller Megaport facility, the Lewisville facility, is located at 2501 S. State Highway 121.[13]

44.     The Google equipment at Megaport's facilities which provides the GCI and Direct Peering services for Google customers are fixed geographical locations. They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently permanent. They are "of the defendant" because Google holds contractual and/or property rights to use this space and to maintain this equipment. Google also ratifies the equipment through advertising of the Megaport locations as authorized to provide these Google services.

*Other Google Presence in this Judicial District*

45.     In addition to the Google presence described above, Google has other pervasive contracts in this Judicial District.

46.     Google has multiple authorized repair centers in the Eastern District of Texas. A resident can visit Google's website to find a list of these repair centers:

---

[11] https://www.megaport.com/megaport-enabled-locations/?locationId=102
[12] *Id.*
[13] *Id.*

## Find a repair partner

Use the table below to find available repair partners in your region. If there isn't an option available for your region, contact us.

Choose your country:    United States  ▾

| Region | Provider | Devices | Type of service | Repair type | Contact |
|--------|----------|---------|-----------------|-------------|---------|
| United States | Google | All Pixel phones | Mail-in and walk-in | In-warranty and out-of-warranty | Google ⧉ * |
| | | Pixel Tablet | Mail-in | Out-of-warranty | Google ⧉ |
| | Asurion or uBreakiFix | All Pixel phones | Mail-in and walk-in | Out-of-warranty | **Phone**: +1 877-320-2237 |
| | | Pixel 6 and later, including Fold | Mail-in and walk-in | In-warranty and out-of-warranty | Asurion or uBreakiFix ⧉ |

*For the most up-to-date partner locations and options for your specific device or damage, refer to Google ⧉ .

In US and Canada, replacement of parts or product service is made available for a minimum of 3 years after end of production for all Pixel devices through Google or its service providers.

Source: https://support.google.com/store/answer/7182296?hl=en

47.     Google's only authorized walk-in repair center, uBreakiFix by Asurion, lists at least four facilities in this Judicial District:



# Google Authorized Repair on Pixel Smartphones

If it's not authorized, it's not fixed.

✓  We use OEM parts, tools, training, and equipment provided by Google.

✓  Most repairs done in 45 minutes or less.

✓  All repairs backed by a 1 Year Warranty.

( Find Your Repair Options )

Source: https://www.ubreakifix.com/google-repair/google-pixel-repair

### Find a nearby store

```
┌─────────────────────────────────────────────┐
│ ⦿  Enter ZIP code or city                  × │
│    Tyler, TX, USA                            │
└─────────────────────────────────────────────┘
```

Use current location

**1 store** near you

```
┌─────────────────────────────────────────────┐
│ ❶ Tyler                                      │
│   6721 S. Broadway Suite 100, Tyler        › │
│   Next available  today, 5:00pm              │
└─────────────────────────────────────────────┘
```

Source: https://www.asurion.com/repairs/tech/locations/tyler/

48.     Google and uBreakiFix teamed up to offer free repairs to those impacted by Hurricane Florence.

49.     uBreakiFix has fixed geographical locations. They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently permanent. These stores are "of the defendant" because Google has contractual rights with

uBreakiFix—the only authorized walk-in repair centers in the United States. Google also ratifies these facilities through its advertising of them through its website.

50.     Google also has branded, mail-in repair service that is contracted with a company called KMT Wireless, LLC, d/b/a Cynergy Hitech. Cynergy Hitech receives phones at its facility in Grapevine, Texas.

## Find a repair partner

Use the table below to find available repair partners in your region. If there isn't an option available for your region, contact us.

Choose your country:    [ United States  ▾ ]

| Region | Provider | Devices | Type of service | Repair type | Contact |
|--------|----------|---------|-----------------|-------------|---------|
| United States | Google | All Pixel phones | Mail-in and walk-in | In-warranty and out-of-warranty | Google ⧉ * |
| | | Pixel Tablet | Mail-in | Out-of-warranty | Google ⧉ |
| | Asurion or uBreakiFix | All Pixel phones | Mail-in and walk-in | Out-of-warranty | **Phone**: +1 877-320-2237 |
| | | Pixel 6 and later, including Fold | Mail-in and walk-in | In-warranty and out-of-warranty | Asurion or uBreakiFix ⧉ |

*For the most up-to-date partner locations and options for your specific device or damage, refer to Google ⧉ .

In US and Canada, replacement of parts or product service is made available for a minimum of 3 years after end of production for all Pixel devices through Google or its service providers.

Source: https://support.google.com/store/answer/7182296?hl=en

51.     Google has operated and is currently operating its Google Maps Street View business and services in this Judicial District. For example, the image below shows the Google Maps Street View of the Eastern District of Texas courthouse in Marshall.



Source: https://www.google.com/maps/@32.5447184,-
94.3668888,3a,75y,211.78h,88.91t/data=!3m6!1e1!3m4!1s1iGIaeAXPTpQQ3PT48kX1Q!2e0!7i
16384!8i8192?entry=ttu

Furthermore, in the lower right-hand corner of the Google Street View above, the image is
credited to Google and states that it was captured in October 2023.



52.     Google also operates a Street View car in and around this Judicial District in order
to provide the Google Maps Street View service.[14]

53.     In addition to the above Google Street View image, Google operates and continues
to operate a fleet of Google Street View vehicles in this Judicial District, including in the counties
of Houston, Trinity, Polk, Angelina, Anderson, VanZandt, Denton, and Collin, as shown below.

---

[14] *See* https://www.google.com/streetview/explore/



Source: https://www.google.com/streetview/explore/

54.    Google provides its Google Express business and services to the residents of this Judicial District by advertising and inviting the residents of this Judicial District, then Defendant arranges for a delivery company to bring the goods and products purchased through the Google Express website to the residents of this Judicial District.[15] This service uses fixed geographical stores in this Judicial District. They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently permanent. They are "of the defendant" because Google ratifies the stores (and selects products of the stores) through its website. Only information provided by Google through its service can be purchased, although the store may have other items for sale.

55.    Google previously leased office space in this Judicial District for about 50 people through its Frisco, Texas office.

56.    Google also provides services to businesses and schools in this Judicial District, including email services, word processing software, electronic file storage services, and video conferencing services. Google brands such services as "G Suite" services. Non-limiting examples of such businesses and schools include the Frisco Independent School District, as shown below.[16]

---

[15] *See* https://support.google.com/express/answer/4561693?hl=en
[16] http://schools.friscoisd.org/hs/lebanontrail/site/resources/google-apps-information

# Google Classroom

Google Classroom is a web-based platform that integrates students' G Suite for Education accounts with Google Docs. Google Classroom saves time and paper and allows teachers to create classes, distribute assignments and communicate.

Google Classroom is already available on Frisco ISD devices. If students are accessing via a family-owned device, it may be helpful to download the app: iOS devices /Android devices.

**Google Classroom Resources**

- **What is Google Classroom and How to Use It?**
- **Parents' Video Guide to Google Classroom**
- **Student Quick Google Classroom Reference**
- **Additional Google Classroom Resources**

**Google Classroom Access & Log in:**
- **At Home**
- **Via the Student Portal**

Source: https://www.friscoisd.org/departments/technology-and-media-services/technology-tools-support#q5

57.     Google also provides advertising services to businesses in this Judicial District, including soliciting reviews of patrons that have visited a business in the Eastern District of Texas, as shown below.



Source: Product Testing at https://www.google.com/maps

58.    Google also monitors traffic conditions in this Judicial District. For example, traffic conditions between a McDonalds and the Federal Courthouse in Marshall, as shown below.



Source: Product Testing at https://www.google.com/maps

59.    Separate and apart from its Google Fi mobile service, Google also provides telephone services to residents in this Judicial District through a product it calls Google Voice.[17]

---

[17] https://voice.google.com/u/0/signup



Source: https://voice.google.com/u/0/signup

60.     Google provides Software-as-a-Service applications, including email and server space, to Texas public universities. Non-limiting examples of such universities are Texas A&M University (which has facilities in this Judicial District) and Texas A&M Commerce (located in this Judicial District), as shown below.



Source: http://google.tamu.edu/

```
Welcome Lions to your new LeoMail 2.0 found in your myLEO homepage located
at myLEO.tamu-commerce.edu.
We hope you take some time to look through your new student email. As a
reminder the new email is a gmail platform and share many features that a
regular gmail account has.

In addition to email, you will have the ability to build your own contacts
list and use the built in calendar for planning and organizing.
The most asked question has revolved around the ability to sync this email
account with your mobile or smart phone device. The answer is ³yes². The
Portal Implementation Team is working on getting both the email and your NEW
myLEO account connected in an application that will be available in June.
```

Source: http://mailman.tamuc.edu/pipermail/students/2012-May/004325.html

*Other Google Presence in the State*

61.    Google also has a pervasive connection to the State of Texas through multiple

commercial activities.

62.    Google has purchased land in Midlothian, Texas where it is currently constructing

a \$600 million data center.[18]

63.    Since 2007, Google has employed "hundreds" of employees in Texas, including in

Austin, Texas.[19]

64.    Google has at least one current office located in Austin, on North MoPac

Expressway,[20] and additional office locations at University Park and Austin Children's Museum.[21]

---

[18] *See* https://www.dallasnews.com/business/real-estate/2019/06/14/google-s-massive-600m-
data-center-takes-shape-in-ellis-county-as-tech-giant-ups-texas-presence/
[19] According to Gerardo Interiano, Google's public affairs and government relations manager, in
a statement. *See* http://www.statesman.com/business/google-lease-200-000-square-feet-
newdowntown-austin-tower/SANZSa3du8QQ4k8ytOC2rJ/
[20] *See* https://www.google.com/intl/en/about/locations/?region=north-america
[21] *See* http://www.statesman.com/business/google-lease-200-000-square-feet-new-
downtownaustin-tower/SANZSa3du8QQ4k8ytOC2rJ/

65.     Google has leased over 200,000 square feet of office space in Austin, Texas at 500 West 2nd Street.[22]

66.     Google has, as of May 2024, job postings for Austin, Texas, Red Oak, Texas, Addison, Texas, Dallas, Texas, Houston, Texas, Midlothian, Texas, and Austonio, Texas (129 postings) including positions such as:

- Power Monitoring Execution Engineer, Google Data Center (Midlothian, TX)

- Network Implementation Engineer, Global Network Delivery (Addison, TX)

- Senior Finance Manager, Data Center Equipment (Austin, TX)

- Data Center Operations Facility Technician, Generators (Red Oak, TX)

- Field Solutions Developer II, Generative AI, Google Cloud (Houston, TX)

- Chrome Enterprise Premium Specialist (Austonio, TX)

67.     Upon information and belief, Defendant has at least eleven (11) entities registered in Texas, including:

- GOOGLE LLC

- GOOGLE ACQUISITION HOLDING, INC.

- GOOGLE COMPARE AUTO INSURANCE SERVICES INC.

- GOOGLE COMPARE CREDIT CARDS INC.

- GOOGLE COMPARE MORTGAGES INC.

- GOOGLE FIBER INC.

- GOOGLE FIBER NORTH AMERICA INC.

- GOOGLE FIBER TEXAS, LLC

---

[22] *See* http://www.statesman.com/business/google-lease-200-000-square-feet-new-downtownaustin-tower/SANZSa3du8QQ4k8ytOC2rJ/

- GOOGLE INC.

- GOOGLE NORTH AMERICA INC.

- GOOGLE PAYMENT CORP.

68.    Google has provided, currently provides, and is currently offering to provide its Google Fiber services to the residents of Austin, Texas and San Antonio, Texas.[23]

69.    Google has invested $200,000,000 in the Spinning Spur Wind Farm Project in Oldham County, Texas.[24]

70.    Google acquired Waze in 2013,[25] and Google's Waze traffic app partners with cities and businesses in Texas, non-limiting examples of which include the Waze partnership with the City of Fort Worth to provide constant traffic data to the city.[26] Another non-limiting example includes the Waze partnership with the Genesis Group in Tyler to decrease emergency response times.[27]

71.    This Court has previously found that Google maintains a regular and established place of business in this Judicial District. *AGIS Software Development LLC v. Google LLC*, Case No. 2:19-CV-00361-JRG, Dkt. 378.

## PATENTS-IN-SUIT

72.    On January 3, 2012, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,090,025 (the "'025 Patent") entitled "Moving-Picture Coding Apparatus, Method and Program, and Moving-Picture Decoding Apparatus, Method and Program." On

---

[23] *See* https://fiber.google.com/cities/austin/ and https://fiber.google.com/cities/sanantonio/
[24] *See* https://venturebeat.com/business/googles-tosses-200m-at-spinning-spur-wind-project-to-bring-its-green-power-to-2-gigawatts/
[25] *See* https://techcrunch.com/2013/06/11/its-official-google-buys-waze-giving-a-social-data-boost-to-its-location-and-mapping-business/
[26] *See* https://dallasinnovates.com/fort-worth-waze-partner-ease-traffic-woes/
[27] *See* https://genesisworld.com/the-genesis-group-joins-waze-connected-citizens-program/

October 4, 2022, the United States Patent and Trademark Office duly and legally issued a Certificate of Correction to the '025 Patent. A true and correct copy of the '025 Patent is attached hereto as Exhibit A.

73.     On May 29, 2018, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,986,303 (the "'303 Patent") entitled "Video Image Coding Data Transmitter, Video Image Coding Data Transmission Method, Video Image Coding Data Receiver, and Video Image Coding Data Transmission and Reception System." A true and correct copy of the '303 Patent is attached hereto as Exhibit B.

74.     On February 26, 2019, the United States Patent and Trademark Office duly and legally issued U. S. Patent No. 10,218,995 (the "'995 Patent") entitled "Moving Picture Encoding System, Moving Picture Encoding Method, Moving Picture Encoding Program, Moving Picture Decoding System, Moving Picture Decoding Method, Moving Picture Decoding Program, Moving Picture Reencoding System, Moving Picture Reencoding Method, Moving Picture Reencoding Program." A true and correct copy of the '995 Patent is attached hereto as Exhibit C.

75.     ACT is the sole and exclusive owner of all right, title, and interest in the '025 Patent, the '303 Patent, and the '995 Patent (collectively, the "Patents-in-Suit") and holds the exclusive right to take all actions necessary to enforce its rights to the Patents-in-Suit, including the filing of this patent infringement lawsuit. ACT also has the right to recover all damages for past, present, and future infringement of the Patents-in-Suit.

## **FACTUAL ALLEGATIONS**

76.     The Patents-in-Suit generally relate to systems and methods for coding and decoding data efficiently.

77.     The '025 Patent generally relates to efficient methods of video encoding and decoding using motion compensation. The technology described in the '025 Patent was developed by Satoru Sakazume of Victor Company of Japan, Ltd.

78.     The '303 Patent generally relates to technology that allows for the efficient transmission and reception of two different resolutions of video data. The technology described in the '303 Patent was developed by Hideki Takehara and Motoharu Ueda of JVC Kenwood Corporation.

79.     The '995 Patent generally relates to hierarchical encoding that implements a process for super-resolution enlargement of video signals. The technology described in the '995 Patent was developed by Satoru Sakazume of JVC Kenwood Corporation.

80.     Defendant has infringed and continues to infringe one or more of the Patents-in-Suit by making, using, selling, offering to sell, and/or importing, and by actively inducing others to make, use, sell, offer to sell, and/or import products, including mobile devices and chipsets thereof, that implement the technology claimed by the Patents-in-Suit. For example, the Accused Products include, but are not limited to, Defendant's Google Pixel smartphone products as described below, that, upon information and belief, encode and/or decode digital video using the AV1 codec using Tensor processors.

81.     Google has had actual notice of the Asserted Patents, at least as of the filing date of this Complaint.

82.     ACT has at all times complied with the marking provisions of 35 U.S.C. § 287 with respect to the Asserted Patents.

## COUNT I
### (Infringement of the '025 Patent)

83.     Paragraphs 1 through 82 are incorporated by reference as if fully set forth herein.

84.     ACT has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '025 Patent.

85.     Defendant has and continues to directly infringe the '025 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '025 Patent. Such products include at least Google Pixel Smartphone products compliant with the AV1 and/or SVT-AV1 Standards including, but not limited to, the Pixel 6 Pro, Pixel 6a, Pixel 7 Pro, Pixel 7a, Pixel Fold, and Pixel 8 Pro (the '025 Accused Products), which practice a moving-picture decoding method comprising the steps of: demultiplexing coded data from an input signal based on a specific syntax structure, the input signal being obtained by multiplexing a coded bitstream obtained by predictive coding, border motion-vector data and post-quantization data obtained by quantization in the predictive coding, the coded bitstream obtained by producing and encoding a residual picture that is a residual signal between a picture to be coded that is an input moving-picture video signal to be subjected to coding and a predictive picture produced from a reference picture that is a local decoded video signal for each of a plurality of rectangular zones, each composed of a specific number of pixels, into which a video area of the moving-picture video signal is divided, obtaining a boundary condition of each of a plurality of borders between the rectangular zones and another plurality of rectangular zones adjacent to the rectangular zones, finding a border, of the reference picture, having a boundary condition that matches the boundary condition, by motion-vector search in the reference picture, and generating the border motion-vector data that is data on a motion vector from a border of the rectangular zone in the picture to be coded to the border of the reference picture thus found, defining a boundary condition of a border that corresponds to the border motion-vector data, from

the reference picture based on the border motion-vector data, and generating an estimated video signal in each rectangular zone in the picture to be coded, that satisfies Poisson's Equation, thus producing the predictive picture; performing entropy decoding to the data thus demultiplexed to generate, at least, the post-quantization data, the border motion-vector data and parameter data required for constructing a specific syntax structure; performing inverse-quantization to the post-quantization data to generate post-quantization orthogonal transform coefficients data; performing inverse-orthogonal transform to the post-quantization orthogonal transform coefficients data to produce a decoded residual picture of one video area; defining a boundary condition of a border that corresponds to the border motion-vector data, from the reference picture based on the border motion-vector data, and generate an estimated video signal in each rectangular zone in the picture to be coded, that satisfies Poisson's Equation, thus producing a first predictive picture; combining the first predictive picture and the decoded residual picture to generate a decoded moving-picture signal; and storing the decoded moving-picture signal for at least one picture as a reference picture.

86.    For example, Defendant has and continues to directly infringe at least claim 10 of the '025 Patent by making, using, offering to sell, selling, and/or importing into the United States mobile devices that are compliant with the AV1 and/or SVT-AV1 Standards, such as the '025 Accused Products, because they demultiplex coded data from an input signal based on a specific syntax structure, the input signal being obtained by predictive coding, border motion-vector data and post-quantization data obtained by quantization in the predictive coding:



## Google Tensor G3 processor specifications

|  | Google Tensor G3 | Google Tensor G2 | Google Tensor |
|---|---|---|---|
| CPU | 1x Arm Cortex-X3 (2.91GHz) 4x Arm Cortex-A715 (2.37GHz) 4x Arm Cortex-A510 (1.70GHz) | 2x Arm Cortex-X1 (2.85GHz) 2x Arm Cortex-A78 (2.35GHz) 4x Arm Cortex-A55 (1.80GHz) | 2x Arm Cortex-X1 (2.80GHz) 2x Arm Cortex-A76 (2.25GHz) 4x Arm Cortex-A55 (1.80GHz) |
| GPU | Arm Mali-G715 (MP7 estimated) | Arm Mali-G710 MP7 | Arm Mali-G78 MP20 |
| Caches | Unknown | 4MB CPU L3 8MB system level | 4MB CPU L3 8MB system level |
| Machine Learning | Third-gen Tensor Processing Unit | Next-gen Tensor Processing Unit | Tensor Processing Unit |
| Media Decode | H.264, H.265, VP9, AV1 | H.264, H.265, VP9, AV1 | H.264, H.265, VP9, AV1 |
| Modem | 4G LTE 5G sub-6Ghz and mmWave | 4G LTE 5G sub-6Ghz and mmWave | 4G LTE 5G sub-6Ghz and mmWave |
| Process | Samsung 4nm (expected) | Samsung 5nm | Samsung 5nm |

Source: https://store.google.com/us/category/phones?hl=en-US
https://www.androidauthority.com/google-tensor-g3-explained-3324692/



FIGURE 1.  Block diagram of a typical hybrid video encoder.

Source: https://ieeexplore.ieee.org/ielx7/8784029/9314963/09536216.pdf

87.     The coded bitstream in the '025 Accused Products is obtained by producing and encoding a residual picture that is a residual signal between a picture to be coded that is an input moving-picture video signal to be subjected to coding and a predictive picture produced from a reference picture that is a local decoded video signal for each of a plurality of rectangular zones, each composed of a specific number of pixels, into which a video area of the moving-picture video signal is divided:



FIGURE 1.  Block diagram of a typical hybrid video encoder.

FIGURE 2.  AV1 10-way block partition tree structure.

Source: https://ieeexplore.ieee.org/ielx7/8784029/9314963/09536216.pdf

88.    The '025 Accused Products obtain a boundary condition of each of a plurality of borders between the rectangular zones and another plurality of rectangular zones adjacent to the rectangular zones, find a border, of the reference picture, having a boundary condition that matches the boundary condition, by motion-vector search in the reference picture, and generate the border motion-vector data that is data on a motion vector from a border of the rectangular zone in the picture to be coded to the border of the reference picture thus found, by using the motion estimation process for a block and locating the pixel values at the border between the current block and the neighboring block. Border motion-vector data is generated when a boundary condition in the reference frame matches the boundary condition in the current frame, and the block motion estimation algorithm uses a comparison of these boundary conditions to generate motion vectors:

> **C. INTER PREDICTION**
> In inter-frame prediction, the block is predicted from samples belonging to previously encoded frames. Both AV1 and VVC use Motion Estimation (ME) and Motion Compensation (MC) algorithms in addition to motion vector prediction tools to reduce the amount of lateral data. Both video formats allow block sizes from $128 \times 128$ to $4 \times 4$ in inter prediction. VVC and AV1 can evaluate 28 and 22 block sizes, respectively, in function of the difference between their frame partition processes.

Source: https://ieeexplore.ieee.org/document/8296419

89.    The '025 Accused Products define a boundary condition of a border that corresponds to the border motion-vector data, from the reference picture based on the border motion-vector data, and generate an estimated video signal in each rectangular zone in the picture to be coded, that satisfies Poisson's Equation, thus producing the predictive picture. For example, the estimated signal generation process in AV1 and/or SVT-AV1 satisfies Poisson's Equation via

the use of smoothing algorithms in Overlapped Block Motion Compensation ("OMBC"). The process involves finding predicted pixels of a block in steady state (that minimizes the residual). The estimated video signal is used to produce a predictive picture (*e.g.*, predictive sample):

(see Fig.2(b) for a 32-tap example) and formulated as

$$w_K(k) = \frac{1}{2} sin(\frac{\pi}{2K}(k + \frac{1}{2})) + \frac{1}{2}, k = 0, 1, ..., K - 1 \quad (1)$$

is applied to every column (see Fig.2(a)) of the overlapping region, and updates $p_{obmc}(x, y)$ as

$$w_{\frac{N}{2}}(y)p_{obmc}(x,y) + (1 - w_{\frac{N}{2}}(y))p_i(x,y). \quad (2)$$

This filter approximately averages the predictions at the common edge, and gradually reduces the influence of the new prediction $p_i$ until it vanishes at the mid-line of the current block, because the conventional block matching $p_0$ often works best for pixels in the center. Then we move on to the second stage to exploit predictors of the left neighbors. Likewise, 1-D filtering will be performed on top of the $p_{obmc}(x, y)$ updated after the first phase: (1) the overlapping region for each left neighbors will be on the right side of the common edge, e.g. the shaded area for $p_4$ in Fig.1(b); (2) we apply the 1-D filter in the horizontal direction, i.e.

$$p_{obmc}(x, y) := w_{\frac{M}{2}}(x)p_{obmc}(x, y) + (1 - w_{\frac{M}{2}}(x))p_i(x, y). \quad (3)$$

Source: https://ieeexplore.ieee.org/document/8296419



Source: https://wenxiaoming.github.io/2019/03/02/The-overview-of-AV1-coding/

90.    The '025 Accused Products perform entropy decoding to the data thus demultiplexed to generate, at least, the post-quantization data, the border motion-vector data, and parameter data required for constructing a specific syntax structure:

*E. ENTROPY CODING*

The entropy coding processes the symbols (quantized coefficients and lateral data) to reduce their statistical redundancy by applying lossless algorithms.

AV1 uses a symbol-to-symbol adaptive multi-symbol arithmetic coder with the probability being updated every new symbol. Each syntax element in AV1 is a member of an alphabet of $N$ elements, and a context consists of a set of $N$ probabilities together with a small count to facilitate fast early adaptation [2].

*D. TRANSFORMS AND QUANTIZATION*

The prediction error, or the residues, between the intra and inter prediction and the original blocks are processed by the transform module (T module, in Fig. 1), which converts the values from the spatial domain to the frequency domain. Then, the quantization step (Q module in Fig. 1) is applied to the transformed coefficients to attenuate or eliminate values associated with spectral components that are not perceptually relevant for the human visual system.

Source: https://ieeexplore.ieee.org/ielx7/8784029/9314963/09536216.pdf

91.     The '025 Accused Products perform inverse-quantization to the post-quantization data to generate post-quantization orthogonal transform coefficients data, and perform inverse-orthogonal transform to the post-quantization orthogonal transform coefficients data to produce a decoded residual picture of one video area.

92.     The '025 Accused Products define a boundary condition of a border that corresponds to the motion-vector data, from the reference picture based on the border motion-vector data, and generate an estimated video signal in each rectangular zone in the picture to be coded, that satisfied Poisson's Equation, thus producing a first predictive picture.

93.     The '025 Accused Products combine the first predictive picture and the decoded residual picture to generate a decoded moving-picture signal:



Source: https://wenxiaoming.github.io/2019/03/02/The-overview-of-AV1-coding/

## 7.14. Loop filter process

### 7.14.1. General

Input to this process is the array CurrFrame of reconstructed samples.

Output from this process is a modified array CurrFrame containing deblocked samples.

Source: https://aomediacodec.github.io/av1-spec/av1-spec.pdf, Page 307

94.     The '025 Accused Products store the decoded moving-picture signal for at least one picture as a reference picture, by updating the set of reference frames.

95.     Defendant has and continues to directly infringe at least claim 10 of the '025 Patent by making, using, offering to sell, selling, and/or importing into the United States products that implement AV1 and/or SVT-AV1 standards, such as the '025 Accused Products.

96.     Google has indirectly infringed and continues to indirectly infringe one or more claims of the '025 Patent, as provided by 35 U.S.C. § 271(b), by inducing infringement by others, such as Google's customers and end-users, in this Judicial District and elsewhere in the United States. For example, Google's customers and end-users directly infringe, either literally or under the doctrine of equivalents, through their use of the inventions claimed in the '025 Patent. Google induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the '025 Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the '025 Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation. Because of Google's inducement, Google's customers and end-users use the '025 Accused Products in a way Google intends and they directly infringe the '025 Patent. Google performs these affirmative acts with knowledge of the '025 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '025 Patent.

97.     Google has indirectly infringed and continues to indirectly infringe one or more claims of the '025 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this Judicial District and elsewhere in the United States. Google's affirmative acts of selling and offering to sell the '025 Accused Products in this Judicial District and elsewhere in the United States and causing the '025 Accused Products to be manufactured, used, sold, and offered for sale contribute to others' use and manufacture of the Accused Products, such that the '025 Patent is directly infringed by others. The accused

components within the Accused Products including, but not limited to, software manufactured by Google, are material to the invention of the '025 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Google to be especially made or adapted for use in the infringement of the '025 Patent. Google performs these affirmative acts with knowledge of the '025 Patent and with intent, or willful blindness, that they cause the direct infringement of the '025 Patent.

98.     Google's infringement of the '025 Patent is and has been willful. Google was on notice of the existence of the '025 Patent and its infringement thereof, or has been willfully blind as to the existence of the '025 Patent and its infringement thereof. As one example, Google is a founding member of the Alliance for Open Media, the organization that publishes the AV1 Specification. The Alliance for Open Media's stated goal was to create a video codec that was free of patent licensing obligations associated with prior video codecs. Google's preference would be that its YouTube product previously used a video codec called HEVC, and Google was motivated to avoid HEVC licensing fees by developing AV1 through the Alliance for Open Media.[28] The Alliance for Open Media, including Google, conducted a "comprehensive evaluation of the video codec patent landscape and performance of patent due diligence by world-class codec engineers and legal professionals during the development stage."[29] Upon information and belief, this "patent due diligence" either uncovered the existence of the '025 Patent and Google's infringement thereof, or should have uncovered the existence of the '025 Patent and Google's infringement thereof. Google could not have reasonably believed that the development of the AV1 video codec could not infringe any valid patent claims, including those of the '025 Patent.

---

[28] https://arstechnica.com/information-technology/2015/09/microsoft-google-amazon-others-aim-for-royalty-free-video-codecs/
[29] https://aomedia.org/press%20releases/the-alliance-for-open-media-statement/

99.     ACT has suffered damages as a result of Defendant's direct, indirect, and willful infringement of the '025 Patent in an amount to be proved at trial.

## COUNT II
### (Infringement of the '303 Patent)

100.     Paragraphs 1 through 82 are incorporated by reference as if fully set forth herein.

101.     ACT has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '303 Patent.

102.     Defendant has and continues to directly infringe the '303 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '303 Patent. Such products include at least Google Pixel Smartphone Products compliant with the AV1 and/or SVT-AV1 Standards including, but not limited to, the Pixel 6 Pro, Pixel 6a, Pixel 7 Pro, Pixel 7a, Pixel Fold, and Pixel 8 Pro (the '303 Accused Products) which include a video image coding data receiver comprising a processor and a memory unit having instructions stored which, when executed by the processor, cause the processor to perform operations comprising receiving basic video image coding data; decoding the received basic video image coding data so as to reproduce a video image; receiving supplementary video image coding data including a supplementary hierarchical picture whose coding order and display order are earlier by a factor of a group of pictures including an intra coded picture and a plurality of inter prediction coded pictures than those of a basic hierarchical picture included in the basic video image coding data, a basic hierarchy and a supplementary hierarchy being set in units of the group of pictures; acquiring basic video image coding data received before supplementary video image coding data that has been received at the moment; and reconstructing

video image coding data from the basic video image coding data and the supplementary video image coding data.

103.    For example, Defendant has and continues to directly infringe at least claim 1 of the '303 Patent by making, using, offering to sell, selling, and/or importing into the United States mobile devices that are compliant with the AV1 and/or SVT-AV1 Standards, such as the '303 Accused Products.

104.    The '303 Accused Products are video image coding data receivers that include a processor and a memory.

105.    The '303 Accused Products are configured to receive and decode basic video image coding data, such as a bitstream of video at 720p resolution, and to decode that data to reproduce a video image.

106.    The '303 Accused Products are configured to receive supplementary video image coding data including a supplementary hierarchical picture, such as a bitstream of video at a 1080p resolution.

107.    The supplementary hierarchical picture's coding order and display order are earlier than those of a basic hierarchical picture by a factor of a group of pictures. For example, AV1 uses an S frame to switch to lower or higher frame rates:

**Switch Frame**
An inter frame that can be used as a point to switch between sequences. Switch frames overwrite all the reference frames without forcing the use of intra coding. The intention is to allow a streaming use case where videos can be encoded in small chunks (say of 1 second duration), each starting with a switch frame. If the available bandwidth drops, the server can start sending chunks from a lower bitrate encoding instead. When this happens the inter prediction uses the existing higher quality reference frames to decode the switch frame. This approach allows a bitrate switch without the cost of a full key frame.

Source: https://aomediacodec.github.io/av1-spec/av1-spec.pdf, at page 5

108.    Each Group of Pictures includes an intra coded picture and a plurality of inter prediction coded pictures:

frame_type specifies the type of the frame:

| frame_type | Name of frame_type |
|---|---|
| 0 | KEY_FRAME |
| 1 | INTER_FRAME |
| 2 | INTRA_ONLY_FRAME |
| 3 | SWITCH_FRAME |

Source: https://aomediacodec.github.io/av1-spec/av1-spec.pdf, at page 150

109.    The supplementary hierarchical picture's coding order and display order are earlier than the basic hierarchical picture because the received data is stored in a buffer before decoding:



Source: https://aomediacodec.github.io/av1-spec/av1-spec.pdf, at page 654-55

Therefore, when an S frame switches from basic to supplementary video data, basic hierarchical pictures are still decoded and displayed out of the buffer.

47

110.    The '303 Accused Products are configured to acquire basic video image coding data from the buffer, which has been received before supplementary video image coding data that has been received at the moment of the switch in resolutions.

111.    The '303 Accused Products reconstruct video image coding data from the basic video image coding data and the supplementary video image coding data:



Source: https://aomediacodec.github.io/av1-spec/av1-spec.pdf, at page 294

112.    Google has indirectly infringed and continues to indirectly infringe one or more claims of the '303 Patent, as provided by 35 U.S.C. § 271(b), by inducing infringement by others, such as Google's customers and end-users, in this Judicial District and elsewhere in the United States. For example, Google's customers and end-users directly infringe, either literally or under the doctrine of equivalents, through their use of the inventions claimed in the '303 Patent. Google induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the '303 Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the '303 Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation. Because of Google's inducement, Google's

customers and end-users use the '303 Accused Products in a way Google intends and they directly infringe the '303 Patent. Google performs these affirmative acts with knowledge of the '303 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '303 Patent.

113.    Google has indirectly infringed and continues to indirectly infringe one or more claims of the '303 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this Judicial District and elsewhere in the United States. Google's affirmative acts of selling and offering to sell the '303 Accused Products in this Judicial District and elsewhere in the United States and causing the '303 Accused Products to be manufactured, used, sold, and offered for sale contribute to others' use and manufacture of the '303 Accused Products, such that the '303 Patent is directly infringed by others. The accused components within the '303 Accused Products including, but not limited to, software manufactured by Google, are material to the invention of the '303 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Google to be especially made or adapted for use in the infringement of the '303 Patent. Google performs these affirmative acts with knowledge of the '303 Patent and with intent, or willful blindness, that they cause the direct infringement of the '303 Patent.

114.    Google's infringement of the '303 Patent is and has been willful. Google was on notice of the existence of the '303 Patent and its infringement thereof, or has been willfully blind as to the existence of the '303 Patent and its infringement thereof. As one example, Google is a founding member of the Alliance for Open Media, the organization that publishes the AV1 Specification. The Alliance for Open Media's stated goal was to create a video codec that was free of patent licensing obligations associated with prior video codecs. Google's preference would be that its YouTube product previously used a video codec called HEVC, and Google was motivated

to avoid HEVC licensing fees by developing AV1 through the Alliance for Open Media.[30] The Alliance for Open Media, including Google, conducted a "comprehensive evaluation of the video codec patent landscape and performance of patent due diligence by world-class codec engineers and legal professionals during the development stage."[31] Upon information and belief, this "patent due diligence" either uncovered the existence of the '303 Patent and Google's infringement thereof, or should have uncovered the existence of the '303 Patent and Google's infringement thereof. Google could not have reasonably believed that the development of the AV1 video codec could not infringe any valid patent claims, including those of the '303 Patent.

115.    ACT has suffered damages as a result of Defendant's direct, indirect, and willful infringement of the '303 Patent in an amount to be proved at trial.

## COUNT III
### (Infringement of the '995 Patent)

116.    Paragraphs 1 through 82 are incorporated by reference as if fully set forth herein.

117.    ACT has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '995 Patent.

118.    Defendant has and continues to directly infringe the '995 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '995 Patent. Such products include at least Google Pixel Smartphone products compliant with the AV1 and/or SVT-AV1 Standards including, but not limited to, the Pixel 6 Pro, Pixel 6a, Pixel 7 Pro, Pixel 7a, Pixel Fold, and Pixel 8 Pro (the

---

[30] https://arstechnica.com/information-technology/2015/09/microsoft-google-amazon-others-aim-for-royalty-free-video-codecs/
[31] https://aomedia.org/press%20releases/the-alliance-for-open-media-statement/

'995 Accused Products) which include a demultiplexer configured to work on a sequence of input encoded bits to implement a process for a prescribed demultiplexing to output at least a first and a second sequence of encoded bits; a first decoder configured to acquire the first sequence of encoded bits obtained with a standard resolution at the demultiplexer to implement thereon a process for a prescribed first decoding to create a sequence of decoded pictures with a standard resolution; a first super-resolution enlarger configured to acquire the sequence of decoded pictures created with a standard resolution at the first decoder to work on the sequence of decoded pictures to implement an interpolation of pixels with a first enlargement to create a sequence of super-resolution enlarged decoded pictures with a first resolution higher than a standard resolution; a first resolution converter configured to acquire the sequence of super-resolution enlarged decoded pictures created at the first super-resolution enlarger to work on the sequence of super-resolution enlarged decoded pictures to implement a process for a prescribed resolution conversion to create a sequence of super-resolution decoded pictures with a standard resolution; a second decoder configured to acquire the second sequence of encoded bits obtained with a standard resolution at the demultiplexer as a set of decoding targets, the sequence of decoded pictures created with the standard resolution at the first decoder as a set of first reference pictures, and the sequence of super-resolution decoded pictures created with the standard resolution at the first resolution converter as a set of second reference pictures, and select one of the set of first reference pictures and the set of second reference pictures based on reference picture selection information to implement a combination of processes for a prescribed prediction and a prescribed second decoding being a decoding with an extension of the standard resolution, to create a sequence of super-resolution pictures decoded with the standard resolution based on the set of decoding targets and the set of selected reference pictures; and a second resolution converter configured to acquire

the sequence of decoded pictures with the standard resolution from the first decoder to work on the sequence of decoded pictures to implement an interpolation of pixels with the second enlargement to create a sequence of enlarged decoded pictures with a high resolution as a second resolution higher than the standard resolution, wherein the set of decoding targets, the set of first reference pictures, and the set of second reference pictures have the same value in spatial resolution.

119.    For example, Defendant has and continues to directly infringe at least claim 2 of the '995 Patent by making, using, offering to sell, selling, and/or importing into the United States mobile devices that are compliant with the AV1 and/or SVT-AV1 Standards, such as the '995 Accused Products.

120.    The '995 Accused Products include a demultiplexer configured to work on a sequence of input encoded bits to implement a process for a prescribed demultiplexing to output at least a first and a second sequence of encoded bits. AV1 and/or SVT-AV1 consist of a pipeline with either super-resolution being active or inactive for each frame. The demultiplexer generates two sequences of bits, the first sequence of bits being the I-Frames sent to a first decoder, and the second sequence of bits being P-Frames sent to a second decoder:

## 5.9.2. Uncompressed header syntax

```
FrameIsIntra = 1
```

Source: https://aomediacodec.github.io/av1-spec/av1-spec.pdf, Page 37-38

## II. HIGH-LEVEL SYNTAX

The AV1 bitstream is packetized into open bitstream units (OBUs). An ordered sequence of OBUs is fed into the AV1 decoding process, where each OBU comprises a variable length string of bytes. An OBU contains a header and a payload. The header identifies the OBU type and specifies the payload size. Typical OBU types include the following.

1) **Sequence Header** contains information that applies to the entire sequence, e.g., sequence profile (see Section VIII) and whether to enable certain coding tools.

2) **Temporal Delimiter** indicates the frame presentation time stamp. All displayable frames following a temporal delimiter OBU will use this time stamp, until the next temporal delimiter OBU arrives. A temporal delimiter and its subsequent OBUs of the same time stamp are referred to as a temporal unit. In the context of scalable coding, the compression data associated with all representations of a frame at various spatial and fidelity resolutions will be in the same temporal unit.

3) **Frame Header** sets up the coding information for a given frame, including signaling inter or intraframe type, indicating the reference frames and signaling probability model update method.

4) **Tile Group** contains the tile data associated with a frame. Each tile can be independently decoded. The collective reconstructions form the reconstructed frame after potential loop filtering.

5) **Frame** contains the frame header and tile data. The frame OBU is largely equivalent to a frame header OBU and a tile group OBU but allows less overhead cost.

6) **Metadata** carries information, such as high dynamic range, scalability, and timecode.

7) **Tile List** contains tile data similar to a tile group OBU. However, each tile here has an additional header that indicates its reference frame index and position in the current frame. This allows the decoder to process a subset of tiles and display the corresponding part of the frame, without the need to fully decode all the tiles in the frame. Such capability is desirable for light field applications [13].

We refer to [9] for bit field definitions and more detailed consideration of high-level syntax.

121.    The '995 Accused Products include a first decoder configured to acquire the first sequence of encoded bits and decode the I-Frames received from the demultiplexer:



Fig. 1. Scaled prediction framework

Source: https://sci-hub.se/https://ieeexplore.ieee.org/document/8954553

122.    The '995 Accused Products include a first super-resolution enlarger configured to acquire the sequence of decoded pictures created with a standard resolution at the first decoder. With super-resolution active, after the normal decoding process is completed, the decoded I-Frames (*i.e.*, sequence of decoded pictures created with a standard resolution at the first decoder)

are further sent to the deblocking, CDEF, upscale, and loop restoration block, where the decoded pictures are enlarged and upscaled to the original resolution (*i.e.*, higher than the standard resolution). In AV1 and/or SVT-AV1, the upscaling and loop restoration operations are referred to as the super-resolve steps (*i.e.*, the first super-resolution enlarger):



Fig. 4. Frame Super-resolution Framework

Source: https://sci-hub.se/https://ieeexplore.ieee.org/document/8954553

## 7.16. Upscaling process

Input to this process is an array inputFrame of width FrameWidth and height FrameHeight.

The output of this process is a horizontally upscaled frame of width UpscaledWidth and height FrameHeight.

If use_superres is equal to 0, no upscaling is required and this process returns inputFrame.

Source: https://aomediacodec.github.io/av1-spec/av1-spec.pdf, Page 325

123.    The '995 Accused Products include a first resolution converter configured to acquire the sequence of super-resolution enlarged decoded pictures created at the first super-resolution enlarger to work on the sequence of super-resolution enlarged decoded pictures to implement a process for a prescribed resolution conversion to create a sequence of super-resolution decoded pictures with a standard resolution. After the loop restoration process, the reconstructed

I-Frames are added to the reference buffer list which are further used for decoding of P-Frames. The reference pictures at the decoding side are scaled according to the resolution of current P-frame which is to be decoded. Since the first super-resolution enlarger provides upscaled decoded reference pictures, the reference pictures are downscaled to match current P-Frame's resolution (frame being decoded by 2nd decoder) to be used as reference picture:

> **A. Scaled Prediction**
>
>     In order to enable the codec to switch frame resolutions mid-stream, both AV1 and its predecessor VP9 support the ability to predict across scales in the inter prediction loop. As shown schematically in Fig. 1, this allows any frame or frames to be non-normatively downscaled or upscaled (Fig. 1 shows downscaling only) on-the-fly before encoding at a different resolution. The reconstructed frame after encoding at the reduced or increased resolution then replaces one of the reference buffer slots at that resolution. Therefore, at any point during the encoding and decoding process, any inter frame could be predicted from references that are at different resolutions, and consequently a normative mechanism to predict a block in that frame from a different resolution reference buffer needs to be defined. In principle, as long as we have defined a normative upscaler and a normative downscaler, such prediction across scales would be possible to support. However it would be more compute efficient to combine such rescaling with subpel interpolation for motion compensation, and that is what AV1 does.

Source: https://sci-hub.se/https://ieeexplore.ieee.org/document/8954553

124.    The '995 Accused Products include a second decoder configured to acquire the second sequence of encoded bits obtained with a standard resolution at the demultiplexer as a set of decoding targets, the sequence of decoded pictures created with the standard resolution at the first decoder as a set of first reference pictures, and the sequence of super-resolution decoded pictures created with the standard resolution at the first resolution converter as a set of second reference pictures, and select one of the set of first reference pictures and the set of second reference pictures based on reference picture selection information to implement a combination of

processes for a prescribed prediction and a prescribed second decoding being a decoding with an extension of the standard resolution, to create a sequence of super-resolution pictures decoded with the standard resolution based on the set of decoding targets and the set of selected reference pictures. The second decoder decodes the P-Frames. When frames are decoded without super-resolution being active and being used as reference frames, the reconstructed frames are used for inter-prediction of the current frame. When super-resolution is active, AV1 and/or SVT-AV1 produce decoded frames which are references that are super-resolved and then downscaled to match the current frame resolution. The second decoder waits for the current P-Frame to be decoded as received from the demultiplexer, and when it is received, the frame can be decoded based on the relevant reference I-Frame, whether super-resolved or non-super-resolved:

> ### A. Scaled Prediction
>
> In order to enable the codec to switch frame resolutions mid-stream, both AV1 and its predecessor VP9 support the ability to predict across scales in the inter prediction loop. As shown schematically in Fig. 1, this allows any frame or frames to be non-normatively downscaled or upscaled (Fig. 1 shows downscaling only) on-the-fly before encoding at a different resolution. The reconstructed frame after encoding at the reduced or increased resolution then replaces one of the reference buffer slots at that resolution. Therefore, at any point during the encoding and decoding process, any inter frame could be predicted from references that are at different resolutions, and consequently a normative mechanism to predict a block in that frame from a different resolution reference buffer needs to be defined. In principle, as long as we have defined a normative upscaler and a normative downscaler, such prediction across scales would be possible to support. However it would be more compute efficient to combine such rescaling with subpel interpolation for motion compensation, and that is what AV1 does.

Source: https://sci-hub.se/https://ieeexplore.ieee.org/document/8954553

125.    Since AV1 and/or SVT-AV1 allow each frame to either be normally decoded or decoded with super-resolve steps, the reference picture buffer set consists of both non-super-

resolved and super-resolved reference pictures (reconstructed frames). For the second decoder to decode the current frame, the reference frame is selected based on the reference index. The reference index, which indicates whether a super-resolved or non-super-resolved reconstructed frame is selected, is the reference picture selection information that is sent in the encoded bitstream.

**ref_frame_idx[ i ]** specifies which reference frames are used by inter frames. It is a requirement of bitstream conformance that RefValid[ ref_frame_idx[ i ] ] is equal to 1, and that the selected reference frames match the current frame in bit depth, profile, chroma subsampling, and color space.

**Note:** Syntax elements indicate a reference (such as LAST_FRAME, ALTREF_FRAME). These references are looked up in the ref_frame_idx array to find which reference frame should be used during inter prediction. There is no requirement that the values in ref_frame_idx should be distinct.

Source: https://aomediacodec.github.io/av1-spec/av1-spec.pdf, Page 327

126. The '995 Accused Products include a second resolution converter configured to acquire the sequence of decoded pictures with the standard resolution from the first decoder to work on the sequence of decoded pictures to implement an interpolation of pixels with the second enlargement to create a sequence of enlarged decoded pictures with a high resolution as a second resolution higher than the standard resolution, wherein the set of decoding targets, the set of first reference pictures, and the set of second reference pictures have the same value in spatial resolution. In AV1 and/or SVT-AV1, the output of the 1st decoder (when super-resolution is not active), the decoded frames (reconstructed references) can also be upscaled. AV1 and/or SVT-AV1 use different 8-tap filter coefficients that can be used for upscaling of the decoded frame.

```
const int16_t av1_resize_filter_normative[(
    1 << RS_SUBPEL_BITS)][UPSCALE_NORMATIVE_TAPS] = {
#if UPSCALE_NORMATIVE_TAPS == 8
  { 0, 0, 0, 128, 0, 0, 0, 0 },        { 0, 0, -1, 128, 2, -1, 0, 0 },
  { 0, 1, -3, 127, 4, -2, 1, 0 },      { 0, 1, -4, 127, 6, -3, 1, 0 },
  { 0, 2, -6, 126, 8, -3, 1, 0 },      { 0, 2, -7, 125, 11, -4, 1, 0 },
  { -1, 2, -8, 125, 13, -5, 2, 0 },    { -1, 3, -9, 124, 15, -6, 2, 0 },
```

Source: https://aomedia.googlesource.com/aom/+/refs/heads/main/av1/common/resize.c

After the reference pictures are selected from the first and second set of reference pictures, the reference pictures are upscaled or downscaled to match to resolution of the encoding targets:



Fig. 2 shows a scenario where a 4x4 block from the source needs to be predicted from a different resolution reference buffer. The motion vectors transmitted in the bitstream are always at the source resolution. So they are first scaled up or down based on the resolution ratio between the reference and source, and the corresponding source block pixels projected on the reference grid can then be obtained, as shown on the right of Fig. 2. Note that the relative sub-pixel positions horizontally (vertically) on the reference grid are the same in each row (column). Hence, the interpolation for scaled prediction can be implemented simply as separable filtering in each dimension using a suitable starting sub-pixel offset and a sub-pixel step between pixels.

Block to predict        Higher resolution reference

Fig. 2. Predicting a block from different (higher shown) resolution reference

Source: https://sci-hub.se/https://ieeexplore.ieee.org/document/8954553, Page 2

127.    Google has indirectly infringed and continues to indirectly infringe one or more claims of the '995 Patent, as provided by 35 U.S.C. § 271(b), by inducing infringement by others, such as Google's customers and end-users, in this Judicial District and elsewhere in the United States. For example, Google's customers and end-users directly infringe, either literally or under the doctrine of equivalents, through their use of the inventions claimed in the '995 Patent. Google induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the '995 Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the '995 Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation. Because of Google's inducement, Google's customers and end-users use the '995 Accused Products in a way Google intends and they directly infringe the '995 Patent. Google performs these affirmative acts with knowledge of the '995 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '995 Patent.

128.    Google has indirectly infringed and continues to indirectly infringe one or more claims of the '995 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this Judicial District and elsewhere in the United States. Google's affirmative acts of selling and offering to sell the '995 Accused Products in this Judicial District and elsewhere in the United States and causing the '995 Accused Products to be manufactured, used, sold, and offered for sale contribute to others' use and manufacture of the '995 Accused Products, such that the '995 Patent is directly infringed by others. The accused components within the '995 Accused Products including, but not limited to, software manufactured by Google, are material to the invention of the '995 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Google to

59

be especially made or adapted for use in the infringement of the '995 Patent. Google performs these affirmative acts with knowledge of the '995 Patent and with intent, or willful blindness, that they cause the direct infringement of the '995 Patent.

129.    Google's infringement of the '995 Patent is and has been willful. Google was on notice of the existence of the '995 Patent and its infringement thereof, or has been willfully blind as to the existence of the '995 Patent and its infringement thereof. As one example, Google is a founding member of the Alliance for Open Media, the organization that publishes the AV1 Specification. The Alliance for Open Media's stated goal was to create a video codec that was free of patent licensing obligations associated with prior video codecs. Google's preference would be that its YouTube product previously used a video codec called HEVC, and Google was motivated to avoid HEVC licensing fees by developing AV1 through the Alliance for Open Media.[32] The Alliance for Open Media, including Google, conducted a "comprehensive evaluation of the video codec patent landscape and performance of patent due diligence by world-class codec engineers and legal professionals during the development stage."[33] Upon information and belief, this "patent due diligence" either uncovered the existence of the '995 Patent and Google's infringement thereof, or should have uncovered the existence of the '995 Patent and Google's infringement thereof. Google could not have reasonably believed that the development of the AV1 video codec could not infringe any valid patent claims, including those of the '995 Patent.

130.    ACT has suffered damages as a result of Defendant's direct, indirect, and willful infringement of the '995 Patent in an amount to be proved at trial.

---

[32] https://arstechnica.com/information-technology/2015/09/microsoft-google-amazon-others-aim-for-royalty-free-video-codecs/
[33] https://aomedia.org/press%20releases/the-alliance-for-open-media-statement/

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, ACT prays for relief against Defendant as follows:

a.      Entry of judgment declaring that Defendant has directly and/or indirectly infringed one or more claims of each of the Patents-in-Suit;

b.      An order pursuant to 35 U.S.C. § 283 permanently enjoining Defendant, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from further acts of infringement of the Patents-in-Suit;

c.      An order awarding damages sufficient to compensate ACT for Defendant's infringement of the Patents-in-Suit, but in no event less than a reasonable royalty, together with interest and costs;

d.      Entry of judgment declaring that Defendant's infringement has been willful and awarding ACT treble damages pursuant to 35 U.S.C. § 284; and

e.      Entry of judgment declaring that this case is exceptional and awarding ACT its costs and reasonable attorney fees under 35 U.S.C. § 285; and

f.      Such other and further relief as the Court deems just and proper.

Dated:  May 10, 2024                    Respectfully submitted,

                                        */s/ Vincent J. Rubino, III*
                                        Alfred R. Fabricant
                                        NY Bar No. 2219392
                                        Email: ffabricant@fabricantllp.com
                                        Peter Lambrianakos
                                        NY Bar No. 2894392
                                        Email: plambrianakos@fabricantllp.com
                                        Vincent J. Rubino, III
                                        NY Bar No. 4557435
                                        Email: vrubino@fabricantllp.com
                                        Joseph M. Mercadante

NY Bar No. 4784930
Email: jmercadante@fabricantllp.com
**FABRICANT LLP**
411 Theodore Fremd Avenue, Suite 206 South
Rye, New York 10580
Telephone: (212) 257-5797
Facsimile: (212) 257-5796

Samuel F. Baxter
Texas Bar No. 01938000
sbaxter@mckoolsmith.com
Jennifer L. Truelove
Texas Bar No. 24012906
jtruelove@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 E. Houston Street, Suite 300
Marshall, Texas 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

*ATTORNEYS FOR PLAINTIFF*
*ADVANCED CODING TECHNOLOGIES, LLC*